

The following constitutes the Memorandum Decision of
the Court.  Signed: February 23, 2021

Roger L. Efremsky
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE | Case No. 18-10665 RLE |
| SONOMA WEST MEDICAL CENTER, INC. | |
| Debtor, | Chapter 7 |
| _____ | |
| TIMOTHY W. HOFFMAN, Trustee in Bankruptcy of the Estate of SONOMA WEST MEDICAL CENTER, INC., | AP NO. 19-01030 |
| Plaintiff, | |
| SONOMA SPECIALTY HOSPITAL, LLC, AMERICAN ADVANCED MANAGEMENT GROUP, INC., GURPREET SINGH, | |
| Defendants. | |

## MEMORANDUM DECISION FOLLOWING TRIAL ON THRESHOLD ISSUE

Before the court for decision is what has been described as the "Threshold Issue";

specifically, who owns the accounts receivable generated when the Debtor Sonoma West

Medical Center (the "Debtor") operated Palm Drive Hospital (the "Hospital") up to and through

September 8, 2018 (the "Pre-September 9, 2018 Receivables").  While there was much

AP NO. 19-01030 - 1

testimony and evidence presented during the course of the four-day trial, the court only need look to two unambiguous contracts to determine that the Pre-September 9, 2018 Receivables are owned by Debtor.

### A.  Procedural History

For purposes of this Memorandum Decision, the relevant procedural history is as follows:

1.  On August 20, 2019, Timothy W. Hoffman, Trustee of the Bankruptcy Estate of Sonoma West Medical Center (the "Plaintiff") filed the above-entitled complaint commencing this adversary proceeding (the "Complaint").  Docket #1.  The Complaint names Sonoma Specialty Hospital, LLC ("SSH"), Gurpreet Singh ("Singh"), and American Advanced Management Group, Inc. ("AAMG") as defendants (collectively, "Defendants").  The Complaint is based on Bankruptcy Code §542 and states three related and interdependent claims for relief: (1) turnover of property of the estate (i.e., the Pre-September 9, 2018 Receivables); (2) an accounting for the Pre-September 9, 2018 Receivables collected and used by Defendants; and (3) damages for conversion of property of the estate.

2.  On October 9, 2019, Defendants filed their Answer (the "Answer") and SSH and AAMG filed Counterclaims (the "Counterclaimants" and the "Counterclaims").  Docket #9.  The Answer contains one affirmative defense that the Pre-September 9, 2018 Receivables are not property of the estate.  The remaining five affirmative defenses (which are identical to the allegations in the five Counterclaims) are all based on the premise that the Pre-September 9, 2018 Receivables are not property of the estate.

3.  On October 14, 2019, Plaintiff filed his Answer to the Counterclaims.  Docket #10.

AP NO. 19-01030 - 2

4.      On October 25, 2019, Defendants filed a Motion for Withdrawal of Reference. Docket #25.  Defendants asserted that withdrawal of the reference was appropriate because all but one claim (i.e., the turnover cause of action) involve non-core issues on which SSH, Singh and AAMG are entitled to a jury trial.

5.      On December 20, 2019, Plaintiff filed a Stipulation for Dismissal of Complaint as to AAMG and Singh.  Docket #43.  As a result of the Stipulation, SSH was the only remaining Defendant and SSH and AAMG remained as Counterclaimants (collectively, "SSH/AAMG").

6.      On January 16, 2020, this court issued a Recommendation Regarding Motion to Withdraw Reference (the "Recommendation").  Docket #47.  The Recommendation recognized that permissive withdrawal was appropriate but recommended to the District Court that the bankruptcy court be permitted to resolve the Threshold Issue.

7.      On June 22, 2020, the Honorable Jeffrey S. White issued an Order Denying Motion for Withdrawal of Reference Without Prejudice to Renewal.  In addition to denying the Motion for Withdrawal of Reference without prejudice, Judge White adopted the bankruptcy court's recommendation that the bankruptcy court resolve the Threshold Issue.[1]  Docket #63.

/ / / /

---

[1] Defendants subsequently sought leave to file a Motion for Reconsideration, which was granted by the District Court.  On August 5, 2020, the District Court entered an order denying the Motion for Reconsideration. The District Court noted that Defendants "do not ask the Court to reverse its prior decision and grant the motion to withdraw the reference.  Instead, they seek 'clarification' about whether the Bankruptcy Court can proceed by a Zoom trial and whether it can proceed without resolving the question of whether they are entitled to a jury trial on the claims, counterclaims, and the Threshold issue."  The District Court went on to find that: (1) the arguments regarding the appropriateness of a Zoom trial were not the proper subject for a motion for reconsideration; and (2) this court had, in fact, engaged in an analysis of whether Defendants had a right to a jury trial and had concluded they did not.  Docket #86.

AP NO. 19-01030 - 3

8.      A trial was held on the Threshold Issue over a four-day period from August 18, 2020, through August 21, 2020.  Post-trial briefs were filed on September 24, 2020.  The Threshold Issue is now ripe for determination.

## B.      Factual History

The facts underlying the current dispute are well-known to the parties and will not be repeated in detail here.  For purposes of this Memorandum Decision, the relevant facts are as follows:

### 1.      The Management and Staffing Services Agreement

On March 18, 2015, Debtor entered into a Management and Staffing Services Agreement (the "MSSA") with the Palm Drive Healthcare District (the "District").  The MSSA authorized Debtor to operate the Hospital on behalf of the District.  Pl. Exh. 1, p. 4 ¶2.1.  The MSSA provided that for operating the Hospital, Debtor would be entitled to compensation consisting of: (1) an annual subsidy of $1 million from tax revenues collected by the District; and (2) a management fee, consisting of "pass through reimbursement from Hospital Revenue of all of [Debtor's] direct and reasonable costs necessary to the provision of its management services . . . under this Agreement" (the "MSSA Management Fee").  Pl. Exh. 1, pp. 9-10, ¶¶5.1 and 5.4.

The MSSA further defined "Hospital Revenue" (from which the MSSA Management Fee would be paid) to mean and include:

(a) all gross revenue from the provision of any and all hospital **services provided on or after the Commencement and during the term of the arrangement, determined on an accrual basis** in accordance with GAAP consistently applied; (b) any and all disproportionate share payments or credits from Medicare or Medicaid; (c) any and all quality assurance and supplemental Medi-Cal payments made by the California Department of Health Care Services to [the] District or [Debtor] after the Commencement Date. . . . and (h) any all [sic] revenue of any other type or any other source related to the operation of the Hospital on and after the Commencement Date.

AP NO. 19-01030 - 4

Pl. Exh. 1, p. 9, ¶5.2 (emphasis added).

The MSSA required Debtor to "assure that all Hospital Expenses incurred in connection with the operation of the Hospital **on or after the Commencement Date and during the term of the Agreement are paid**. . . from Hospital Revenue to the extent it is available to cover Hospital Expenses[.]" Pl. Exh. 1, p. 9, ¶5.3 (emphasis added).

Section 8.1 provided that Debtor would operate the Hospital under the MSSA commencing on March 18, 2015 and continuing "for a period of five (5) years, unless sooner terminated as provided herein." Pl. Exh. 1, p. 12, ¶8.1.

Section 8.2 provided that both the District and Debtor had the ability to terminate the MSSA for "cause." Pl. Exh. 1, p. 12, ¶8.2. The defined instances of "cause" ranged from a simple default to intentional fraudulent acts. Pl. Exh. 1, p. 12-13, ¶¶8.2.1 - 8.2.2. The MSSA also contained an integration clause which provided that the MSSA was the entire agreement and that no amendments, changes or additions shall be binding unless made in writing and signed by the parties. Pl. Exh. 1, p. 17, ¶12.5.

Debtor commenced operation of the Hospital pursuant to the MSSA sometime in the Fall of 2015. Plaintiff's Post-Trial Brief, Docket #138, p. 8, line 1.

By the Summer of 2018, the District and Debtor had concluded that it was financially impossible for Debtor to continue to operate the Hospital. Plaintiff's Post-Trial Brief, Docket #138, p. 8, lines 10-11; Defendant's and Counterclaimants' Post-Trial Brief, Docket #139, p. 5, lines 9-11. Thus, the District withheld the $1 million subsidy due to Debtor to cover operating losses and terminated the MSSA pursuant to Section 8.2.1, citing Debtor's "inability to meet its financial obligations to operate the [H]ospital" (the "Termination Letter"). Def. Exh. L; Plaintiff's Post-Trial Brief, Docket #138, p. 8, lines 11-13.

AP NO. 19-01030 - 5

Debtor operated the Hospital continuously from the Fall of 2015 until 11:59 p.m. on September 8, 2018 ("Termination"). Plaintiff's Post-Trial Brief, Docket #138, p. 8, lines 1-3. Upon Termination, Debtor had several million dollars in accrued and outstanding accounts receivable for services rendered prior to 11:59 p.m. on September 8, 2018. Id. at p. 8, lines 3-4. In addition, Debtor had several million dollars in accrued and outstanding accounts payable to numerous creditors who had provided goods and services to Debtor and Debtor's patients prior to September 8, 2018 at 11:59 p.m. Id. at p. 8, lines 5-7.

### 2. The Management Services Agreement

On or about August 26, 2018, the District entered into a Management Services Agreement (the "MSA") with AAMG. Pl. Exh. 33, p. 1. The MSA specifically anticipated that AAMG would promptly convert the Hospital to a Long-Term Acute Care Hospital[2] and gave AAMG the authority to take the steps to accomplish that goal. Pl. Exh. 33, p. 1, Introduction; p. 2, ¶2.2. The MSA stated that this conversion was necessary for the Hospital's survival. Pl. Exh. 33, p. 1, Introduction. The MSA further provided that the MSA was intended to be a bridge to AAMG ultimately entering into an agreement with the District to acquire all or part of the assets of the Hospital. Pl. Exh. 33, p. 1, Introduction; p. 6, ¶5.2; p. 8, ¶11.

The MSA provided that for operating the Hospital, AAMG would be entitled to a Management Fee consisting of: (1) a fixed amount of $100,000 per month; and (2) the commercially reasonable, and industry standard, fees, costs and expenses incurred by AAMG

---

[2] See Pl. Exh. 3, p. 2 at ¶2.2(d) (AAMG shall "file for the change of licensure immediately following the Effective Date and assist the District in attaining the change of ownership as quickly as possible.")

AP NO. 19-01030 - 6

in the course of performing its services under the MSA (the "MSA Management Fee"). Pl. Exh. 33, p. 6, ¶4.2.

Of particular note, the MSA provided,

> The revenues, accounts receivable and all other government payments from all such billings **shall be property of the District.** Those revenues, accounts receivable and other government payments shall be used to pay the Management Fee of AAMG incurred **in performing its obligations under this Agreement[.]**

Pl. Exh. 33, p. 3, ¶2.6(a) (emphasis added).

While Debtor was not a party to the MSA, the MSA did provide that "[a]ll hospital debts, contracted engagements, and legal obligations entered into prior to the Effective Date will remain the sole responsibility of [Debtor, and] debts incurred on behalf of the Hospital by AAMG following the Effective Date will be the responsibility of AAMG." Pl. Exh. 33, p. 2, ¶2.5. The MSA had an integration clause which confirmed that the MSA was the entire agreement and that no changes or additions to the MSA shall be recognized unless made in writing and signed by the parties. Pl. Exh. 33, p. 10, ¶20.

Concurrently with the negotiations of the MSA, AAMG formed Defendant SSH, and subsequently assigned all its rights and liabilities under the MSA to SSH. Plaintiff's Post-Trial Brief, Docket #138, p. 9, lines 14-16. SSH took over operation of the Hospital under the MSA on September 9, 2018, at 12:00 a.m. Id. at p. 9, lines 17-18.

### 3. *The Pre-September 9, 2018 Receivables*

While there is much dispute regarding the ownership of, and the rights to use, the Pre-September 9, 2018 Receivables following the transfer of the Hospital management from Debtor to SSH, the court believes it is uncontroverted that SSH collected an unknown number of Pre-September 9, 2018 Receivables and used the funds from those receivables in its operation of the Hospital.

AP NO. 19-01030 - 7

### 4.     The Parties' Arguments

Stripped of all the hyperbole, SSH/AAMG's basic argument is that SSH was entitled to use the funds from collection of the Pre-September 9, 2018 Receivables because:

1/ The MSSA was terminated "for cause" and, as a result, Debtor was divested of any further rights to the Pre-September 9, 2018 Receivables;

2/ Once the MSSA was terminated "for cause," the MSA became the "only operative agreement," and the MSA permitted SSH to utilize the accounts receivable without distinguishing between pre- and post-September 9, 2018 receivables; and

3/ In any event, Debtor did not prove it's ownership to the Pre-September 9, 2018 Receivables had accrued because Debtor failed to establish the provision of management services (including the billing, collecting and paying vendors) that would give rise to an accrual and provided no countervailing evidence to the District's termination of the MSSA "for cause."

Plaintiff's basic argument is that the Pre-September 9, 2018 Receivables are owned by Debtor because:

1/ The MSSA's provision for Hospital Revenue to be determined on an accrual basis means that Debtor's ownership right in the Pre-September 9, 2018 Receivables vested when Debtor performed the services that gave rise to the Pre-September 9, 2018 Receivables; and

2/ There is no provision in the MSSA that divests Debtor of the accrued rights to the Pre-September 9, 2018 Receivables in the event of termination or otherwise.

### C.     Contract Interpretation

The parties agree that the starting point for the court's analysis is the language of the relevant contracts themselves.

AP NO. 19-01030 - 8

The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties at the time the contract is formed. <u>Waller v. Truck Ins. Exch., Inc.</u>, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995), <u>as modified on denial of reh'g</u> (Oct. 26, 1995) (citing Cal. Civ. Code §1636). Such intent is to be inferred, if possible, solely from the written provisions of the contract. <u>Id.</u> at 17 (citing Cal. Civ. Code §1639). "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense or a special meaning is given to them by usage.'" <u>Id.</u> (citing Cal. Civ. Code §1644 and §1638) (other citations omitted). Language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. <u>Id.</u> at 18 (citation omitted). Courts will not strain to create an ambiguity where none exists. <u>Id.</u> (citation omitted). "Nor is '[t]he language of a contract . . . made ambiguous simply because the parties urge different interpretations." <u>Int'l. Bhd. of Teamsters v. NASA Servs., Inc.</u>, 957 F.3d 1038, 1044 (9th Cir. 2020) (citation omitted).

Where ambiguity does exist, extrinsic evidence may be received to clarify the intent of the parties. <u>Molybdenum Corp. of America v. Kasey</u>, 176 Cal.App.2d 357, 363, 1 Cal.Rptr. 400 (Cal. Dist. Ct. App.1959) (citation omitted). "It is also well established, however, that if upon a reading of the whole contract the portion of the contract under attack is clear and explicit no extrinsic evidence will be received to vary its plain terms." <u>Id.</u> (citation omitted); <u>see also</u>, <u>Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co.</u>, 20 Cal.2d 751, 760, 128 P.2d 665 (1942) ("The fundamental canon of construction which is applicable to contracts generally is the ascertainment of the intention of the parties (Civ. Code §1636), and in accordance with

AP NO. 19-01030 - 9

section 1638 of the Civil Code, the language of the agreement, if clear and explicit and not conducive to an absurd result, must govern its interpretation."); <u>Spitser v. Kentwood Home Guardians</u>, 24 Cal.App.3d 215, 220, 100 Cal.Rptr. 798 (Cal. Ct. App. 1972) ("When the language is clear and explicit, does not involve an absurdity (Civ. Code §1638) and no ambiguity is shown, evidence of conduct is irrelevant. In other words, evidence to clarify an ambiguity is not needed when no ambiguity is shown to exist.").

Here, both Plaintiff and SSH/AAMG agree that the relevant contracts are unambiguous and therefore, extrinsic evidence is not required to resolve the Threshold Issue.[3] The court agrees.[4] Thus, the next question is what are the "relevant contracts"?

### 1. The "Relevant Contracts"

Plaintiff and SSH/AAMG agree the MSSA and MSA are contracts to be interpreted by this court. SSH/AAMG also urges the court to consider the Termination Letter[5] and the post-bankruptcy Medical Receivables Collection Agreement.[6] The court finds that to the extent the Termination Letter and the post-bankruptcy Medical Receivables Collection Agreement are "contracts," they are irrelevant to the question at hand and therefore declines to consider them.

---

[3] Plaintiff argues in the alternative - the contracts are unambiguous and no extrinsic evidence is necessary, but if the contracts are ambiguous, extrinsic evidence requires a finding in Plaintiff's favor. SSH/AAMG, on the other hand, take a very strict position that the contracts are unambiguous and no extrinsic evidence is appropriate. In support of its position, SSH/AAMG asserted a running objection to the admission of all extrinsic evidence presented at trial.

[4] As a result, the court sustains SSH/AAMG's running objection to the admission of extrinsic evidence.

[5] Def. Exh. L.

[6] Def. Exh. D. SSH/AAMG's actual position on the appropriateness of the court's consideration of the Medical Receivables Collection Agreement is inconsistent. First, they argue that it should be considered. <u>See</u> Defendant's and Counterclaimants' Post-Trial Brief, Docket #139, p. 12, lines 11-17. In the very next paragraph, however, they argue that the Medical Receivables Collection Agreement should not be considered. <u>Id.</u> at p. 12, lines 18-22. The court's determination that the Medical Receivables Collection Agreement is irrelevant makes analysis of these inconsistencies unnecessary.

AP NO. 19-01030 - 10

California Civil Code defines a contract as "an agreement to do or not to do a certain thing," and which creates an obligation. Cal. Civ. Code §1549 (West 2021); <u>H. Liebes & Co. v. Klengenberg</u>, 23 F.2d 611, 612 (9th Cir. 1928). Under California law, the essential elements of a contract are: (1) parties capable of contracting; (2) the parties' consent; (3) a lawful object; and (4) sufficient consideration. Cal. Civ. Code §1550 (West 2021).

The Termination Letter is not a contract. It is not an agreement, it does not create an obligation, there are no contracting parties and there is no consideration. The Termination Letter is simply a notice to Debtor of the termination of the MSSA and the District's intent to enter into the MSA. To the extent that SSH/AAMG relies on the Termination Letter to support the contention that the MSSA was terminated "for cause," it is unnecessary, because, as noted below, the terms of the MSSA itself are conclusive on this point. Thus, the court will not consider it.

The Medical Receivables Collection Agreement is, in a vacuum, a contract. In the context of this inquiry, however, it is nothing more than an unconsummated and nonbinding agreement between Plaintiff and SSH regarding their respective interpretations of their obligations and rights under the MSSA and the MSA on a going-forward basis. Because the MSSA and the MSA are unambiguous, the Medical Receivables Collection Agreement is unnecessary to the court's inquiry. Thus, the court will not consider it.

For the foregoing reasons, the court's analysis and interpretation of the "relevant contracts" will only include the MSSA and the MSA.

### 2. *The MSSA*

The MSSA unambiguously vests ownership of the Pre-September 9, 2018 Receivables with Debtor.

AP NO. 19-01030 - 11

Section 5.1 of the MSSA provides that in "consideration of the management services provided by [Debtor, Debtor] shall receive pass through reimbursement from Hospital Revenue of all of its direct and reasonable costs necessary to the provision of its management services to the Hospital under this Agreement." Pl. Exh. 1, ¶5.1. "Hospital Revenue" is then defined as: (a) all gross revenue from the provision of **any and all hospital services provided** on or after the Commencement and **during the term of the arrangement, determined on an accrual basis in accordance with GAAP** consistently applied; [and] (h) all revenue of any other type or any other source related to the operation of the Hospital on and after the Commencement Date. Pl. Exh. 1, ¶5.2 (emphasis added).

It is undisputed that the Pre-September 9, 2018 Receivables were necessarily for "services provided" by Debtor "during the term" of the MSSA. Thus, the next question is what "determined on an accrual basis in accordance with GAAP" means.

The accrual basis of accounting is in accordance with GAAP. Raj Gnanarajah, *Cash Versus Accrual Basis of Accounting: An Introduction*, Congressional Research Service, R43811, December 12, 2014 at p. 3. Under accrual basis of accounting, "revenue is recorded when it is earned, and expenses are reported when they are incurred. In other words, under accrual accounting, revenue and expenses are recognized regardless of when payment is actually made or received." Id. at p. 1. For purposes of the Pre-September 9, 2018 Receivables, "from an asset perspective, an accrual is recorded when a service has been performed or a product has been delivered. . . but the payment has not yet been received." Id. at p. 3; see also, Nat'l. Med. Enters. v. Bowen, 851 F.2d 291, 292 (9th Cir. 1988) ("When hospitals report their cost data they must use the accrual basis of accounting. 42 C.F.R. §413.24(a). 'Under the accrual basis of accounting, revenue is reported in the period when it is

AP NO. 19-01030 - 12

earned, regardless of when it is collected, and expenses are reported in the period in which they are incurred, regardless of when they are paid.'"). Thus, under the clear and unambiguous language of the MSSA, any receivables for services provided during the term of the MSSA (i.e., pre-September 9, 2018) are owned by Debtor.

The court's determination that Debtor owns the Pre-September 9, 2018 Receivables is also supported by paragraph 5.3 of the MSSA and paragraph 2.5 of the MSA.

Paragraph 5.3 of the MSSA provides that Debtor "will assure that all Hospital Expenses *incurred* in connection with the operation of the Hospital *on or after the Commencement date and during the term of the Agreement* are paid. . .*from Hospital Revenue*." Pl. Exh. 1, p. 9, ¶5.3. Similarly, paragraph 2.5 of the MSA provides that "All hospital debts. . .*entered into prior to the Effective Date* will remain the sole responsibility of [Debtor]. … No debt *incurred prior to the Effective Date* will be assumed by AAMG." Pl. Exh. 33, p. 2. ¶2.5. Under both the MSSA and MSA, even if services or goods were provided to Debtor on the very last day (i.e., September 8, 2018), and Debtor was not billed or invoiced until after September 8, 2018, Debtor would still be responsible for those expenses. Both of these paragraphs are consistent with the concept of accrual accounting, consistent with the Hospital Revenue being determined on an accrual basis and support the court's determination that Debtor owns the Pre-September 9, 2018 Receivables.

The court also notes that the effect of interpreting the MSSA to find that SSH was entitled to use the Pre-September 9, 2018 Receivables would be twofold. First, it would saddle Debtor with all the debts incurred up to and through September 8, 2018, while preventing Debtor from collecting the receivables for the services that created the debt. Second, it would effectively leave Debtor's creditors in a no-man's land where Debtor could not pay its debts

AP NO. 19-01030 - 13

because access to receivables for the services that created the debts were cut off, while relieving SSH of any requirement to use those receivables to pay the debts. It is patently ridiculous that the District would have granted SSH the rights to use the receivables for services rendered by Debtor, while at the same time providing that SSH did not have to use those receivables to pay any of the debts created by those services. The court declines to interpret the MSSA so punitively; especially when doing so requires the court to read the MSSA in a manner that is inconsistent with its plain language. See Molybdenum Corp. of America v. Kasey, 176 Cal.App.2d at 364 (citation omitted) ("Where a contract is susceptible of two interpretations, one of which is reasonable and fair, and the other is unreasonable and unfair, the latter interpretation must be rejected and the first accepted.").

### 3. The MSA

The plain language of the MSA similarly does not support SSH/AAMG's position that it was entitled to use the Pre-September 9, 2018 Receivables.

Section 4.2 of the MSA provides,

> AAMG's compensation for the services rendered pursuant to [the MSA] shall be a fixed amount of $100,000 per month plus the commercially reasonable, and industry standard, fees, costs and expenses incurred by AAMG in the course of performing its services under this Agreement ("Management Fee").

Pl. Exh. 33 at p. 6, ¶4.2.

SSH/AAMG relies on Section 2.6 for the proposition that the District gave SSH the right to use the Pre-September 9, 2018 Receivables to pay the Management Fee. Section 2.6 says no such thing. The first sentence of section 2.6 simply relegates SSH to the role of billing

AP NO. 19-01030 - 14

agent.[7] The next sentence specifically states that "[t]he revenues, accounts receivables and all other government payments from all such billings ***shall be property of the District***."  Pl. Exh. 33 at p. 6, ¶4.2(a) (emphasis added).  The final sentence of section 2.6 provides, "Those revenues, accounts receivable and other government payments shall be used to pay the Management Fee of AAMG incurred in performing its obligations under this Agreement in accordance with section 4 below."  SSH/AAMG argues that section 2.6 makes no distinction between pre- or post-September 9, 2018 accounts receivable, thus SSH was entitled to use all the receivables.  Once again, in a vacuum, this may be true.  But it ignores entirely the MSSA and the fact that the District could not assign the rights to use the Pre-September 9, 2018 Receivables to SSH because Debtor already owned them.

### 4. Termination of the MSSA did Not Terminate Rights Already Accrued under the MSSA

SSH/AAMG, in an apparent attempt to avoid the plain language of the MSSA and the lack of any helpful plain language in the MSA, next advances the novel argument that even if there were accrual of the Pre-September 9, 2018 Receivables, once the MSSA was terminated, the MSA became the "only operative agreement," and any rights and obligations associated with the MSSA (including the accrued rights to the Pre-September 9, 2018 Receivables) were also terminated.  This argument is also without merit.

As an initial matter, SSH/AAMG repeatedly asserts that the MSSA was terminated "for cause," in an apparent attempt to imply that Debtor's malfeasance caused the termination and,

---

[7] "AAMG shall serve as the billing and collection agent of the Hospital for all Services and supplies provided by Hospital to the patients of the Hospital."  Pl. Exh. 33, p. 3, ¶2.6(a).

AP NO. 19-01030 - 15

as a result, Debtor should be punished with divestiture of its ownership of the accrued Pre-September 9, 2018 Receivables. This argument is unpersuasive.

The MSSA provided for termination in three different ways: (1) termination by expiration of the agreement; (2) termination upon transfer of the Hospital License to Debtor; or (3) termination for "cause." Pl. Exh. 1, pp. 12-13, ¶8.2-8.3. When the MSSA terminated, it had not expired, nor had the Hospital License been transferred to Debtor. Thus, the MSSA was necessarily terminated "for cause." While SSH/AAMG's use of the term "for cause" is intended to be inflammatory, in the context of the MSSA, it is rather unextraordinary. Specifically, section 8.2 provides that either the District or the Debtor could terminate the MSSA "for cause." Pl. Exh. 1, p. 12, ¶ 5.2. Review of the section further reveals that the instances of cause ranged from simple inability to perform, to fraud. Id. Thus, the fact that the MSSA was terminated "for cause," in and of itself, is of little import.

In addition, SSH/AAMG's pejorative use of the term "for cause" and the related implication that Debtor's malfeasance was to blame for the termination of the MSSA also ignores the fact that the Hospital, operating as an acute care hospital, had struggled to be profitable for years. Palm Drive Health Care District filed bankruptcies in 2007 and 2014 while running the Hospital. See, In re Palm Drive Healthcare District, Bankruptcy Case No. 07-103880-AJ and In re Palm Drive Health Care District, Bankruptcy Case No. 14-10510-CN. Debtor then unsuccessfully attempted to bring the Hospital to profitability, ultimately filing the underlying bankruptcy in 2018. Importantly, in apparent recognition that the Hospital would never be sustainable as an acute care hospital, SSH was brought in, not to run the Hospital as-is, but to turn the facility into a Long-Term Acute Care Hospital, and to do so as quickly as possible, See Pl. Exh. 33, p. 1 ("WHEREAS, THE DISTRICT recognizes that a reorganization

AP NO. 19-01030 - 16

of services offered in the Hospital is ***necessary for its ongoing survival***) (emphasis added); ("WHEREAS, AAMG. . . is willing to provide its experience, skills and staff to facilitate the hospital's reorganization, reclassification, and subsequent management pending a transfer of ownership for the hospital's license, and assets to AAMG."); ("WHEREAS, AAMG wishes to convert the Hospital's federal status to that of a Long-term Acute Care Hospital[.]"); and p. 2, ¶2.2(d) ("AAMG [to] file for the change of licensure immediately following the Effective Date and assist the District in attaining the change of ownership ***as quickly as possible***.") (emphasis added). As a result, SSH/AAMG's insistence that termination of the MSSA "for cause" equates to Debtor malfeasance and should result in termination of Debtor's accrued rights to ownership of the Pre-September 9, 2018 Receivables under the MSSA is unavailing.

Assuming for the sake of argument that Defendants were correct, and Debtor's malfeasance caused the termination of the MSSA, there is still no basis to find that Debtor was divested of its accrued ownership rights to the Pre-September 9, 2018 Receivables.

First and most importantly, the MSSA contains no provision that explicitly or implicitly provides that Debtor would be divested of its rights to accrued receivables upon termination of the MSSA for cause or otherwise. If the District had intended to divest Debtor of the rights to accrued receivables in the event of a termination "for cause" or in any other specified event, it certainly could have (and presumably would have) said so in the MSSA itself. It did not. As the MSSA contains an integration clause, and the MSSA was never amended, there is no basis to infer such a provision.

Second, California law does not support SSH/AAMG's argument. California Civil Code section 3300 provides, "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment

AP NO. 19-01030 - 17

proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code §3300 (West 2021); see also, Maxwell v. Dolezal, 231 Cal.App.4th 93, 97-98, 179 Cal.Rptr.3d 807 (Cal. Ct. App. 2014) (to establish a cause of action for breach of contract, plaintiff must plead and prove: (1) existence of a contract; (2) plaintiff's performance or non-performance; (3) defendant's breach; and (4) resulting damages to the plaintiff); Bramalea California, Inc. v. Reliable Interiors, Inc., 119 Cal.App.4th 468, 473, 14 Cal.Rptr.3rd 302 (Cal. Ct. App. 2004) (a breach of contract is not actionable without damages). Thus, under California law, upon breach and termination of the MSSA, the District would simply have a claim for damages against Debtor. The District would then have to file a lawsuit against Debtor and obtain a judgment based on actual harm sustained. The District obtained no such judgment.[8] Even if the District had obtained a judgment, there is nothing in the MSA to support the next required logical step - that the judgment became SSH's to enforce or that the Pre-September 9, 2018 Receivables became SSH's to use. There is also nothing in the MSA that granted SSH the standing to pursue the District's rights under the MSSA in the event the District elected not to.

Finally, SSH/AAMG asserts that under contract law, termination of a contract discharges any executory obligations. Defendant's and Counterclaimants' Post-Trial Brief, Docket #139, p. 17, lines 19-25. The court agrees with SSH/AAMG's recitation of the law on

---

[8] That the District did not obtain a judgment against Debtor also undercuts SSH/AAMG's contention that the Pre-September 9, 2018 Receivables did not "accrue" because Debtor failed to provide the "management services" required under the MSSA (including billing and collecting and paying vendors). Surely if Debtor had materially breached the MSSA sufficient to disallow payment, the District would have pursued its rights against Debtor. The fact that it did not speaks volumes. In any event, SSH/AAMG's simply saying that Debtor did not provide "management services" is not sufficient to make it so.

AP NO. 19-01030 - 18

this limited point. SSH/AAMG then goes on to assert that Debtor's ownership rights to the Pre-September 9, 2018 Receivables are executory and therefore discharged because: (1) there was no evidence that Debtor had provided sufficient management services prior to termination; and (2) there were no services to provide once the MSSA was terminated. Id. at 17-18. The latter point is not in dispute as Debtor does not seek any receivables that post-date September 8, 2018. As stated previously, however, SSH/AAMG is simply wrong on the former point. Under the plain language of the MSSA and principles of accrual accounting, the Pre-September 9, 2018 Receivables accrued when the services were performed. Thus, the fact that the Pre-September 9, 2018 Receivables were for services provided by Debtor during the term of the MSSA is conclusive on the issue of when they accrued. Further, the sufficiency of Debtor's services is not for SSH/AAMG to determine. It was squarely and solely in the District's purview to pursue Debtor for any perceived deficiencies in its performance under the MSSA. It did not.

Thus, the actual legal question is: what is the effect of contract termination on obligations that have already accrued? The answer to that question lies in the very same legal authorities cited by SSH/AAMG and is the exact opposite of the answer asserted by SSH/AAMG.

In Grant v. Aerodraulics Co., 91 Cal.App.2nd 68, 204 P.2d 683 (Cal. Dist. Ct. App. 1949), a dispute arose out of a licensing agreement that gave the defendant licensee the option to terminate the agreement in certain events. Id. at 70. Defendant terminated the agreement and plaintiff sued. Id. The lower court cancelled the contract and awarded plaintiff $7,000 in accrued and unpaid royalties. Defendant appealed the monetary award. Id. The appellate court analyzed the cancellation provisions of the contract to determine if they were intended to

AP NO. 19-01030 - 19

operate retrospectively, thereby relieving defendant of the obligation to pay the accrued royalties. Id. at 72. The court stated,

> [W]e nevertheless cannot give a construction to paragraph 13 which would allow the defendant to escape liability for a minimum royalty that had already accrued. The words "terminate," "revoke" and "cancel," as used in the context of paragraph 13 in reference to the written agreement, all have the same meaning, namely the abrogation of so much of the contract as might remain executory at the time notice is given, and must be sharply distinguished from the word "rescind," which appears nowhere in the paragraph, and which conveys a retroactive effect, meaning to restore the parties to their former position (citations omitted). According to the settled rule of construction **"the exercise of an option to terminate prevents liability for further transactions but does not affect obligations which have already accrued."**

Id. at 72-73 (citations omitted) (emphasis added).

Similarly, Witkin states, "On 'termination' all obligations which are still executory on both sides are discharged **but any right based on prior. . . performance survives.**" 1 Witkin, Summary of California Law (11th), Contracts §955.

Applying these authorities, it is incontrovertible that Debtor's ownership rights to the Pre-September 9, 2018 Receivables, which accrued when the services were performed (i.e., pre-September 9, 2018), survived termination of the MSSA.

### D. Conclusion

For all of the above reasons, the court finds that the Pre-September 9, 2018 Receivables accrued during the term of the MSSA and therefore, are owned by Debtor. A separate order shall issue.

*** END OF MEMORANDUM DECISION ***

AP NO. 19-01030 - 20

## **Court Service List**

No Court Service Required

AP NO. 19-01030 - 21