**Entered on Docket**
**October 22, 2021**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



The following constitutes the Memorandum Decision of
the Court.  Signed: October 22, 2021

_____

**Roger L. Efremsky**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE

SONOMA WEST MEDICAL CENTER, INC.,     Case No. 18-10665 RLE

      Debtor.                  Chapter 7

_____

TIMOTHY W. HOFFMAN, Trustee,      Adversary Proceeding

      Plaintiff,            No. 19-1030

v.

SONOMA SPECIALTY HOSPITAL, LLC,

      Defendant.

_____

**MEMORANDUM DECISION REGARDING PLAINTIFF'S DAMAGES**

**I. Introduction**

    The court bifurcated the issues in this case in order to

first hold a trial on the Threshold Issue - ownership of the pre-

-1-

September 9, 2018 receivables (the "Receivables"). In August 2020, the court held a four-day trial on the Threshold Issue. In February 2021, the court issued its decision on the Threshold Issue in which it concluded that the Receivables were property of the Debtor's estate (the "Decision"). AP Dkt. No. 140.

The court now rules on the remaining issue in this Adversary Proceeding: the amount Defendant owes to Plaintiff, the Trustee, for the Receivables Defendant wrongfully appropriated.

These are the court's findings of fact and conclusions of law under Bankruptcy Rule 7052. For the reasons explained below, the court now finds and concludes that Defendant owes Plaintiff $2,134,576 for the Receivables, plus pre-judgment interest and costs.

**II. Jurisdiction**

The court has jurisdiction under 28 U.S.C. §1334 and the District Court's General Order 24. Under 28 U.S.C. §157(b)(1), bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, and may enter appropriate orders and judgments subject to review under 28 U.S.C. §158.

The Complaint alleges three claims for relief: turnover, accounting, and conversion. It alleges the Adversary Proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(A) (administration of the estate), (E) (orders to turn over property of the estate), and (O) (other proceedings affecting the liquidation of assets of the estate). AP Dkt. No. 1, ¶4. The Answer admits the Complaint's turnover claim is core under

§157(b)(2)(E). AP Dkt. No. 9, ¶4.

The court finds that the gravamen of the accounting and conversion claims is the same as the turnover claim such that they may also be construed as core under §157(b)(2)(E). If they are not construed as core, the accounting and conversion claims fit within §157(b)(2)(C) as counterclaims by the estate against parties filing claims against the estate because Defendant filed a request for payment of an administrative expense claim (the "Request") arising from the same facts alleged in the Complaint. Main Case Dkt. Nos. 63-66. When the Trustee opposed the Request, Defendant responded that the Trustee's opposition should be viewed as a counterclaim by the Trustee. Main Case Dkt. No. 80.

Based on the foregoing, the court finds that this entire Adversary Proceeding is either a core proceeding under 28 U.S.C. §157(b)(2)(C), as a counterclaim by the estate against persons filing claims against the estate, or as a request for turnover under §157(b)(2)(E). As such, this court may enter a final judgment in this Adversary Proceeding.

In the alternative, if the accounting and conversion claims are not deemed core under §157(b)(2)(C) or (E), by filing the Request, Defendant consented to this court entering a final judgment. See Wellness Int'l Network v. Sharif, 575 U.S. 665 (2015) (bankruptcy courts may hear and determine non-core proceedings and enter appropriate orders and judgments with the consent of all parties).

If the District Court disagrees with this interpretation, these are the court's proposed findings of fact and conclusions of law and recommendation to the District Court under §157(c)(1).

-3-

**III. Background**

The parties are familiar with the background in this case and certain facts are repeated here only to provide context. The court incorporates by reference the Decision and the Memorandum Decision dismissing Defendant's Counterclaim. AP Dkt. Nos. 140 and 218. To the extent necessary, the court also takes judicial notice of certain documents filed in connection with the trial on the Threshold Issue.

**A. The Parties' Relationships with the District**

The Palm Drive Healthcare District (the "District"), a debtor in chapter 9 case no. 14-10510, owned what was known as the Palm Drive Hospital in Sebastopol, California (the "Hospital"). In 2015, the Debtor began to operate the Hospital pursuant to the terms of the Management and Staffing Services Agreement with the District (the "MSSA"). Pl. Ex. 1. The District terminated the MSSA as of midnight on September 8, 2018. At that point, Defendant Sonoma Specialty Hospital took over operation of the Hospital pursuant to the terms of its agreement with the District, the Management Services Agreement (the "MSA"). Def. Ex. C.

The MSA made Defendant the agent for the District in billing and collecting receivables generated during Defendant's operation of the Hospital but the District retained ownership of them. MSA ¶2.6. Defendant, through its parent American Advanced Management Group ("AAMG"), had an option to purchase the Hospital which it later exercised. Ch. 9 Dkt. No. 481, Disclosure Statement, p. 33. At the end of 2019 it consummated the purchase with an effective date of April 2019. MSA ¶11; Def. Ex. LL, term sheet for sale of

*Damages* -4-

Hospital; AP Dkt. No. 90, Gia Smith Dec., ¶3; AP Dkt. No. 93, Salas Dec., ¶7, Ex. X, Defendant's business plan.

On September 26, 2018, Debtor filed this chapter 7 case as a skeletal filing. That is, it was filed without the required schedules and statement of financial affairs. Upon his appointment as Trustee, Timothy Hoffman began investigating Debtor's assets and liabilities as he is duty-bound to do by Bankruptcy Code §704. Over the course of the next few weeks, he learned that Debtor's assets included certain inventory and equipment at the Hospital and certain accrued Receivables. Hoffman Trial Testimony, Day 1, p. 23-36.

**B. Bank Accounts and Tentative Agreement**

During the time period that the Debtor operated the Hospital, it had an account at Regions Bank for the deposit of its funds from the U.S. Center for Medicare and Medicaid Services (the "DDA Account"). These accounts are highly regulated and take time to obtain. When Defendant took over operating the Hospital, it had not yet obtained its own such account. Because of this, Defendant began using Debtor's DDA Account without the Trustee's knowledge or consent. Sometime in October 2018, Regions Bank froze the DDA Account due to its concern over Defendant's use of it. Hoffman Trial Testimony, Day 1, p. 27-31; p. 36-37.

At an initial meeting on October 18, 2018 with Gia Smith, then CEO of both Defendant and the Hospital, and representatives of the District, the Trustee learned that Defendant was depositing its funds into the DDA Account. At this meeting, Defendant - through Gia Smith - claimed it had an immediate need to access co-mingled funds in this DDA Account to meet its

*Damages* -5-

payroll. Hoffman Trial Testimony, Day 1, p. 27-28. The Trustee testified that both Defendant and the District told him that most of the money in this account belonged to Defendant. [1] Hoffman Trial Testimony, Day 1, p. 27.

At the time of this initial meeting, the Trustee did not have bank statements or any way to verify the accuracy of these representations. As a result, based on their representations, he agreed that Defendant could make use of the funds in the DDA Account which he later learned was approximately $325,000. Hoffman Trial Testimony, Day 1, p. 44. Following this meeting, the District transferred $150,000 to the Trustee - the amount the District and the Defendant said was the estate's money. Hoffman Trial Testimony, Day 1, p. 29.

The Trustee also testified that he was not making a gift of these funds to Defendant as this would have been illegal. Hoffman Trial Testimony, Day 1, p. 29. Gia Smith agreed the use of these funds was not a gift and she was never told Defendant could keep these funds. Smith Trial Testimony, Day 2, p. 45. At this October meeting, Gia Smith also proposed that Defendant collect the Receivables in exchange for a fee.

---

[1] Gia Smith denied saying this but admitted that these funds were generated from services provided by the Debtor while it ran the Hospital. She also testified that *all* funds "belonged to the District" and that "Sonoma West would be the District." Smith Trial Testimony, Day 2, p. 34:22-25. To be clear, Sonoma West was the Debtor and *not* the District. The witness appeared to be intentionally conflating the names of the entities to fuel Defendant's claim to the Receivables despite the fact that under the MSSA, the Debtor owned them, not the District. The court found Gia Smith's testimony of dubious credibility and gives it little weight.

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 6 of 30

Because the Trustee had no ability to undertake collection himself, he tentatively agreed to this idea through which Defendant would do the collecting, provide periodic accountings, and turnover collected money to the Trustee, retaining 60% - 70% of what it collected as its fee. Hoffman Trial Testimony, Day 1, p. 30.

The Trustee's counsel then sent a draft of a medical receivables collection agreement (the "MRCA") to Defendant. Def Ex. D. This agreement was never consummated, due to Defendant's lengthy delay in signing and returning it, and Defendant's failure to undertake the reporting and payment obligations it had ostensibly agreed to. Hoffman Trial Testimony, Day 1, p. 67:10-19.

**C. Fall 2018 to Spring 2019**

From the Fall of 2018 until February 2019, Gia Smith told the Trustee that it was impossible to differentiate between the Receivables generated by the Debtor before September 9 and those generated during Defendant's operation of the Hospital due to the record keeping of third party billing and coding service provider, TruBridge, LLC/Computer Programs and Systems, Inc. ("TruBridge"). Hoffman Trial Testimony, Day 1, p. 67:10-19. Because the Trustee had no access to the relevant business records, he necessarily accepted this description of the state of the records. Hoffman Trial Testimony, Day 1, p. 30. However, he also began to suspect that the situation was not as Defendant's representatives had described.

In February 2019, the Trustee obtained a Bankruptcy Rule 2004 Exam Order regarding TruBridge. Main Case Dkt. No. 35.

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 7 of 30

Through this discovery, the Trustee learned that Gia Smith's representation regarding the inability to differentiate between pre-September 9 and post-September 9 receivables was patently untrue. "[W]e found out from TruBridge that we weren't being told the truth." Hoffman Trial Testimony, Day 1, p. 67.

In April 2019, at the request of Regions Bank, the Trustee sought an order compelling turnover of the funds in the Regions Bank account. Over Defendant's objection, the Trustee obtained an order compelling Regions Bank to turnover all funds in the DDA Account. Main Case Dkt. No. 50. The Trustee then received $322,228 from Regions Bank and has held this pending resolution of the dispute over ownership of the Receivables.

**D. The Trustee's Settlement with the District**

On May 6, 2019, the Trustee filed a request for payment of a $4.8 million administrative claim in the District's Chapter 9 case based on certain provisions of the MSSA. Ch. 9 Dkt. No. 503; Pl. Ex. 60. The $4.8 million total in the administrative claim was made up of $1 million for a tax reimbursement; $1.135 million in furniture, fixtures and equipment at the Hospital; $614,056 in inventory located at the Hospital; and $2.1 million in Receivables.

The District objected to the allowance of this administrative claim. In May 2019, the Trustee and the District reached a compromise settling their dispute (the "Ch. 9 Settlement" and the "Ch. 9 Settlement Agreement"). Pl. Ex. 25. The Ch. 9 Settlement was approved and made part of the Chapter 9 confirmation order entered in June 2019. Ch. 9 Dkt. No. 544; Def. Ex. K.

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 8 of 30

The Ch. 9 Settlement called for the payment by the District of $500,000, and specifically excluded from its scope any issues regarding the ownership of the Receivables.

Recital G of the Ch. 9 Settlement Agreement provided:

> The [T]rustee contends that certain sums and/or property are due the [Debtor's] estate from the [D]istrict pursuant to the MSSA, and that [Defendant] has misappropriated accounts receivable belonging to the [Debtor's] estate in an amount not less than $2,445,166 and that the [D]istrict is jointly and severally liable for any claims held by the [Debtor's] estate against [Defendant]. The [D]istrict denies the allegations of the chapter 9 administrative claim, asserts various affirmative defenses, and denies it has any liability to the [Debtor's] estate whatsoever.

Pl. Ex. 25, p. 2.

The Ch. 9 Settlement Agreement also provided for mutual general releases as between the District and the Trustee. It then specifically provided that this $500,000 payment excluded both Defendant and the Receivables from this release. It defined Defendant as one of the "excluded parties" with respect to the mutual release between the District and the Trustee and stated as follows:

> The [T]rustee shall have the exclusive right to assert, commence, prosecute and recover any and all claims against the excluded parties arising out of the alleged use and/or misappropriation of the [Debtor's] accounts receivable.

Pl. Ex. 25, p. 4.

In July 2019, the Trustee filed his motion pursuant to Bankruptcy Rule 9019 to obtain this court's approval of the Ch. 9 Settlement. Main Case Dkt. No. 59. The court entered its order approving the Ch. 9 Settlement on August 20, 2019. Main Case Dkt. No. 72.

//

*Damages*                                     -9-

**E. Defendant's Administrative Expense Claim Request**

While approval of the Ch. 9 Settlement was pending in this court, on August 7, 2019, Defendant filed its Request. The Request was based, *inter alia*, on Defendant's theory that the Trustee had tortiously interfered with the collection of *Defendant's* receivables and therefore Defendant should be compensated based on a "quantum meruit or benefit basis" measured by the MRCA's 60% - 70% of the Receivables. Main Case Dkt. Nos. 63-66.

Defendant's reply to the Trustee's opposition to the Request argued that the Trustee's opposition should be treated as a counterclaim and that the Trustee should dismiss the Complaint. Main Case Dkt. No. 80. Because the factual and legal issues raised by the Complaint and the Request overlapped, the court denied the Request and adopted Defendant's suggestion that *all* of the issues be resolved in the context of the Adversary Proceeding.

**F. The Adversary Proceeding**

The Complaint states three claims for relief. AP Dkt. No. 1. The first claim is based on Bankruptcy Code §541(a) and §542 and seeks turnover of the Receivables as property of the estate.[2] The

---

[2] Under §541(a)(1), the commencement of a case creates an estate comprised of all legal or equitable interests of the debtor in property. Pursuant to §542(a), an entity in possession of property that the trustee may use, shall deliver it to the trustee, and *account* for it. Section 542(b) provides that an entity that owes a debt that is property of the estate shall pay such debt to the trustee, except to the extent that such debt may be offset under §553 against a claim against the debtor.

*Damages*                                        -10-

second claim alleges that because Defendant used the Debtor's DDA Account, funds belonging to the estate were co-mingled with Defendant's funds thus giving rise to the right to an interlocutory judgment for an accounting and a final money judgment according to proof. The third claim alleges that Defendant is liable to Plaintiff for damages arising from its conversion of property of the estate.

The Answer generally denies the key allegations of the Complaint, and asserts that Defendant - through its relationship with the District - owned or had the exclusive right to use the Receivables. AP Dkt. No. 9, ¶24 (Receivables are owned by Defendant); ¶37 (Defendant had and has all right, title, and interest in Receivables). The affirmative defenses focus on allegations that the Trustee's fraud - in claiming to own the Receivables - or gross negligence, defeat his right to relief. Defendant also filed a Counterclaim which essentially restated the allegations of the affirmative defenses.

For purposes of the present ruling, the court notes that neither the Answer nor the Counterclaim assert any affirmative defenses or claims based on setoff, recoupment, payment, waiver, quantum meruit, or estoppel; nor do they raise in any manner any other theory that would serve to mitigate, reduce or eliminate Plaintiff's damages. Finally, Defendant did not articulate a defense based on the Trustee having unclean hands.

### G. The First Phase of the Trial

The court held a four-day trial to determine the Threshold Issue. In the Decision, the court concluded that the Receivables are property of the Trustee's estate based on the language of the

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 11 of
30

MSSA and the accrual accounting principles explained in the Decision. AP Dkt. No. 140.

### H. The Damages Phase of the Trial

This phase of the trial focused on the amount of Plaintiff's damages arising from Defendant's refusal to return the Receivables. Plaintiff's expert witness Austin Wade examined relevant bank statements, Defendant's own records, and TruBridge documents and concluded that $1,769,286 was the principal amount of the Receivables collected and withheld by Defendant. Pl. Ex. 58, Wade Report. He added to this (1) the $325,263 in the Regions Bank DDA Account as of September 9, 2018; (2) the $40,027 in the Exchange Bank account as of September 9, 2018; and (3) $14,922 subsequently collected by Defendant. He then deducted the $150,000 paid to the Trustee in November 2018 and the $322,229 turned over by Regions Bank in response to the turnover order, for a total of $2,134,576. Pl. Ex. 58. Plaintiff also claims pre-judgment interest at 7% and costs. Pl. Ex. 59, Wade interest calculation.

Defendant concedes that $1,769,286 is the starting point for the calculation of Plaintiff's damages. AP Dkt. No. 243, Defendant's Post-Trial Brief. However, Defendant argues that (1) the funds in the two bank accounts should not be added; (2) it is entitled to a $500,000 credit for the Ch. 9 Settlement; (3) it is entitled to a reduction of some $554,545 based on its billing and collection costs under various theories; and (4) Plaintiff is not entitled to pre-judgment interest. Plaintiff disputes each of these points. AP Dkt. No. 242, Plaintiff's Post-Trial Brief.

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 12 of 30

**IV. Discussion**

    **A. Plaintiff has Viable Claims for Relief**

    Defendant's Post-Trial Brief argues that Plaintiff has no viable claims to pursue and thus cannot recover damages. AP Dkt. No. 243, p. 13-15. These arguments have no merit.[3]

    First, Defendant argues the accounting claim fails because accounting is a remedy not a claim and may only be used where a legal action demanding a fixed sum is impracticable, citing _Civic Western Corp. v. Zila Industries, Inc._, 66 Cal. App.3d 1 (1977). _Civic Western_ does not support Defendant's argument. It merely provides a definition of when an accounting cause of action may be appropriate under California law and concludes that the accounting cause of action in that case was appropriate because of the complicated commercial relationship of the parties. _Id._ at 14. Also, Bankruptcy Code §542(a) specifically provides that a party in possession of property of the estate "shall deliver" and "account for" such property or it value.

    As the Trustee's testimony explained, the records regarding the Receivables were in the hands of Defendant and the District; Plaintiff could not initially demand a fixed sum and necessarily had to seek an accounting. Defendant's Answer also stated that a "precise accounting" could not be obtained. AP Dkt. No. 9, ¶27.

    Second, Defendant argues the conversion claim fails because the Trustee obtained a writ of attachment, thereby electing

---

[3] These arguments are reminiscent of those Defendant raised in its opposition to the issuance of the writ of attachment. AP Dkt. No. 175. They were rejected then, and for different but related reasons, should not be revived now.

_Damages_          -13-

remedies and waiving the tort claim of conversion, citing <u>Baker</u>
<u>v. Superior Court</u>, 150 Cal. App.3d 140 (1983). As <u>Baker</u> explains,
this waiver doctrine is disfavored. <u>Baker</u>, at 145. Furthermore,
the doctrine is essentially a form of equitable estoppel and
involves situations where a party chooses one path, and by doing
so causes substantial prejudice to the other party. <u>Glendale Fed.</u>
<u>Sav. & Loan Assn. v. Marina View Heights Dev. Co.</u>, 66 Cal.App.3d
101, 137 (1977). There is no evidence before this court that
issuance of Plaintiff's writ of attachment has caused prejudice
to Defendant and, viewing the entire record in this case, there
is no basis to impose any sort of estoppel. In addition,
Plaintiff has stated he is not seeking punitive damages and is
thus not seeking concurrent but inconsistent remedies based on
the same set of facts. AP Dkt. No. 181, p. 3.

Defendant also argues that conversion requires wrongful acts
and there were none because the Trustee *allowed* Defendant to use
estate assets for the *benefit* of the District and not for
Defendant's own benefit. This argument strains credulity for
several reasons but two stand out: First, Plaintiff allowed
Defendant access to the DDA Account in October 2018 based on the
representations of Defendant and the District that the funds in
it were primarily Defendant's. Once the facts were clear, the
Trustee demanded turnover of the Receivables, including the funds
in the DDA Account. Even Defendant's own witness reluctantly
admitted Defendant was never told it could keep the Receivables
and they were not a gift. Smith Trial Testimony, Day 2, p. 45.

Second, the argument that the Receivables were used for the

*Damages*                           -14-

*benefit* of the Hospital so there was no wrongful act is equally fallacious. Defendant leased the Hospital from the District, and had agreed to purchase it. In September 2018, Defendant started the process of changing the Hospital's licensing which it knew would take at least six months. Defendant's business plan projected losses for the first year of its operation. AP Dkt. No. 9, Answer, ¶18. Defendant completed its purchase in December 2019 with an effective date of April 2019. AP Dkt. No. 90, Smith Dec., ¶3; Ch. 9 Dkt. No. 481, Disclosure Statement, p. 33. To claim a benefit redounded to anyone but itself from its misappropriation of the Receivables is nonsense.

Finally, Defendant argues that the turnover claim fails because turnover is not appropriate when property's ownership is in dispute as it was here, citing U.S. v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991). As such, Defendant contends - in a head-spinning bit of circular reasoning - that the turnover claim is really a conversion claim which has been waived due to the issuance of the writ of attachment. The fact that the court has now ruled that Plaintiff owns the Receivables sinks this argument from the start. In addition, it is misguided and conceptually flawed.

There is language in many cases stating generally that turnover is not to be used when ownership is disputed. See, In re Gurga, 176 B.R. 196, 199-200 (9th Cir. BAP 1994) (stating turnover involves the return of undisputed funds; chapter 11 debtor's complaint for breach of contract, conversion, accounting, and turnover stated non-core claims subject to

*Damages*                                    -15-

arbitration).

In <u>In re Process America, Inc.</u>, 588 B.R. 82 (Bankr. C.D. Cal. 2018), the court considered the argument that use of turnover is limited in this way and pointed out there is a split of authority among the Circuits about this disputed ownership issue. The court viewed <u>Gurga</u> as fundamentally a case regarding jurisdiction. The court found persuasive <u>In re Commercial Financial Services, Inc.</u>, 251 B.R. 414, 423 (Bankr. N.D. Okla. 2000) and concluded that turnover of disputed funds may be ordered where a creditor has filed a proof of claim and subjected itself to the jurisdiction of the bankruptcy court to adjust its rights. <u>Process America</u>, at 101.

The court finds the reasoning of <u>Process America</u> persuasive. In this case, by filing the Request, Defendant subjected itself to the jurisdiction of this court. Main Case Dkt. Nos. 63-66. Plaintiff's claim for turnover is not a breach of contract claim masquerading as a turnover claim which may, in the abstract, have raised jurisdictional issues.

For all of these reasons, Plaintiff has viable claims for relief in the Adversary Proceeding.

**B. Bank Balances on September 9, 2018**

As of September 9, 2018, there was $325,263 in the Regions Bank DDA Account and $40,027 in the Exchange Bank account. Pl. Ex. 58, Wade Report. Defendant contends that the Trustee is not entitled to add to his damages the $325,263 in the Regions Bank DDA Account because the Trustee *allowed* Defendant to use this money when it gave Gia Smith "unconditional access" to it.

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 16 of 30

1   Defendant also argues that the Trustee is not entitled to add the

2   $40,027 in the Exchange Bank account because it did not have

3   access to this account which was in the District's name. AP. Dkt.

4   No. 243, Def. Post-Trial Brief, p. 27-28.

5       These arguments have no merit. In October 2018, a

6   representative of the District and Gia Smith told the Trustee

7   that the bulk of the funds in the DDA Account belonged to

8   Defendant. Based on this representation - which he had no way to

9   confirm and at that point no reason to doubt - and Defendant's

10  claimed emergency need to use the money in this account, he

11  agreed Defendant could *use* funds in the DDA Account. He did so

12  believing the funds were Defendant's own and only $150,000 in

13  this account was property of the estate.

14      As it turned out, this was not the case. The entirety of the

15  $325,263 in the DDA Account on September 9, 2018 was generated

16  during Debtor's operation of the Hospital and is clearly property

17  of the Trustee's estate. The Trustee made no gift of this to

18  Defendant and never told Defendant it could keep this money. Gia

19  Smith reluctantly confirmed this. Smith Trial Testimony, Day 2,

20  p. 45:2-16.

21      Defendant also argues that it lacked access to the Exchange

22  Bank account and that the funds in it were not property of the

23  estate because the account was in the District's name. However,

24  Gia Smith testified that if Defendant needed funds from this

25  account all she needed to do was ask the District to send a

26  check. Smith Trial Testimony, Day 2, p. 53:25-54:11. This negates

27  the contention that Defendant lacked access to this account. The

28

*Damages*                              -17-

fact that the account was in the District's name does not mean the funds in the account as of September 9, 2018 are not property of the estate and they were in fact the Debtor's funds accrued while Debtor ran the Hospital.

### C. Credit for the $500,000 Settlement with the District

Defendant argues that it is entitled to a $500,000 credit against the Trustee's damages for the Ch. 9 Settlement paid by the District because, in its purchase of the Hospital, Defendant credited the District for this payment. AP Dkt. No. 243, Def. Post-Trial Brief, p. 26-27; Def. Ex. LL, term sheet for sale of Hospital, ¶6. This argument also has no merit.

The Ch. 9 Settlement Agreement between the District and the Trustee provided that (1) the Receivables were excluded from the $500,000 allowed administrative claim; (2) Defendant was excluded from the mutual general release; and (3) the Trustee was given the exclusive right to pursue collection of the Receivables from Defendant. In short, the District's $500,000 payment was for the other elements in the Trustee's administrative claim: the inventory; the furniture, fixtures, and equipment; and the tax revenue payment. It did not include the Receivables.

Not deterred by what is straightforward and obvious, Defendant points to language in recital G in the Ch. 9 Settlement Agreement in which the Trustee contends, and the District denies, that Defendant has "misappropriated accounts receivable belonging to" the estate and that the District "is jointly and severally liable for any claims" held by the estate against Defendant.

Based on this disputed contention, Defendant argues that it

*Damages* -18-

1  is entitled to a credit for this $500,000 under California Code
2  of Civil Procedure §877(a). This section provides:

>   where a release ... is given in good faith before verdict or
>   judgment to one or more of a number of different tortfeasors
>   claimed to be liable for the same wrong, or to one or more
>   other co-obligors mutually subject to contribution rights,
>   it shall reduce the claims against [other tortfeasors or co-
>   obligors] in an amount stipulated by the release.

7       Plaintiff argues in response that §877(a) is inapplicable
8  because the Ch. 9 Settlement excluded the Receivables. The
9  District's payment was for the personal property - retained by
10 Defendant and used in its operation of the Hospital - and tax
11 revenue payment only. The court agrees. The language of the Ch. 9
12 Settlement Agreement is clear. To the extent testimony is
13 relevant on this point, the Trustee confirmed this was his
14 intention in reaching the compromise with the District. Hoffman
15 Trial Testimony, Day 1, p. 34. The court rejects Defendant's
16 strained arguments to the contrary.

17      Plaintiff also argues that the District and the Defendant
18 were not co-obligors mutually subject to contribution rights vis
19 a vis Plaintiff, citing California Civil Code §1432 (except as
20 provided in §877, a party to a joint or joint and several
21 obligation who satisfies more than his share of the claim against
22 all may require a proportionate contribution from all the parties
23 joined with him). Plaintiff contends there was no contractual
24 relationship between Defendant and Debtor, a required predicate
25 here. This argument is not persuasive but it is also irrelevant
26 for the reasons explained above.
27 //
28

*Damages*                           -19-

**D. Billing and Collection Costs as Mitigation of Damages**

1. The "Unauthorized Transaction" Theory

Defendant claims that because the Trustee did not seek court approval of the MRCA, he created an "unauthorized transaction" under which he allowed Defendant to engage in billing and collecting the Receivables from Fall 2018 to April 2019. AP Dkt. No. 243, Def. Post-Trial Brief, p. 18.

Defendant claims its billing and collection costs totaled $554,545 and this must reduce Plaintiff's damages. Defendant argues the Trustee "could have mitigated his damages by not allowing" Defendant to use his assets and not waiting until April 2019 to demand Defendant stop. The Trustee "should be viewed as not mitigating his damages at least to the extent of the billing and collection costs." Def. Post-Trial Brief, p. 21:5-13.

Defendant argues the Trustee "solely benefited" from this unauthorized transaction and the value of the benefit must mitigate the Trustee's damages, citing Turpin v. Sortini, 31 Cal. 3d 220 (1982) (wrongful life case, in general, when tortious conduct has caused harm and in so doing has conferred a special benefit to the interest that was harmed, its value may act as mitigation to the extent that this is equitable). Def. Post-Trial Brief, p. 19:22-24.

Defendant posits that if it had not been able to use the funds in the DDA Account and the Receivables, the Hospital would have closed and the collection of the Receivables would have ceased, leaving the Trustee empty-handed, as he surely must have known. Defendant sees this as the "only plausible explanation"

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 20 of 30

1 for the Trustee failing to seek court approval of the MRCA. Def.
2 Post-Trial Brief, p. 18-19.

3 In what is possibly a generous interpretation of this
4 argument, Plaintiff suggests this is really a quantum meruit
5 theory, citing Day v. Alta Bates Medical Center, 98 Cal.App.4th
6 243 (2002). AP Dkt. No. 242, Pl. Post-Trial Brief, p. 9. There,
7 the court explained that for a quantum meruit recovery there must
8 be an express or implied request for services from one party and
9 the services must be provided with an intent to benefit that
10 party; ultimately, it is a question of equity. Id. at 248-49.

11 According to Plaintiff, if the MRCA is viewed as such a
12 request for services, this request was conditioned on the
13 Defendant performing the steps outlined for it in the MRCA which
14 it never did. Also, to the extent any services were performed,
15 they were not intended to benefit Plaintiff and did not, in fact,
16 benefit Plaintiff: Defendant consistently stated that the
17 Receivables were its to use as it saw fit. The court agrees with
18 this analysis. Quantum meruit recovery is not appropriate here
19 for these reasons.

20 In addition, the entire record in this Adversary Proceeding,
21 and in the chapter 7 case itself, confirm that it would be
22 inequitable to allow any sort of reduction in the Trustee's
23 damages based on these alleged collection costs under any theory.
24 Defendant first admitted that Plaintiff owned the Receivables.
25 Main Case Dkt. No. 48, acknowledging that Defendant "has
26 collected receivables that date from the Debtor's operation of
27 the hospital, and thus belong to" the bankruptcy estate; AP Dkt.
28

*Damages* -21-

No. 36, Ex. 9, Gia Smith email stating "we have no intention to not pay what is owed." The MRCA itself acknowledged that Plaintiff owned the Receivables. Defendant then reversed course, accusing the Trustee of fraud and fraud on the court because he claimed to own the Receivables. For months, Defendant insisted it was impossible to tell whether any Receivables were generated before or after September 9, 2018 but the Trustee's discovery from TruBridge in early 2019 showed this was patently untrue. Equity will not reward this behavior.

Finally, this "unauthorized transaction" argument is confounding and non-sensical. It is hard to address it without going down the same convoluted rabbit-hole Defendant has dug for itself. The court declines the invitation to engage with this fundamentally unsound reasoning. Defendant misappropriated the Receivables and did so consciously and deliberately through its course of obfuscation and dissembling and its strained legal arguments. To suggest these actions redounded to Plaintiff's benefit and that Plaintiff caused his own damages by permitting Defendant to do this is offensive. To suggest - without evidence - that Defendant bestowed a benefit on Plaintiff because the Hospital would have closed if Defendant had not taken the funds in the DDA Account and misappropriated the Receivables is doubly offensive.

Plaintiff also argues this quantum meruit theory - to the extent it is plausible - had to be raised as a compulsory counterclaim pursuant to Fed. R. Civ. P. 13(a) because it arises out of the transaction sued upon and it does not require adding

*Damages*                                    -22-

another party over whom the court cannot acquire jurisdiction. AP Dkt. No. 242, Pl. Post-Trial Brief, p. 11. Bankruptcy Rule 7013 modifies Fed. R. Civ. P. 13(a) and provides that a party sued by a trustee need not state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate unless the claim arose *after* the entry of an order for relief. Defendant's alleged collection costs were incurred after the Debtor's September 26, 2018 petition date. Accordingly, Plaintiff's point is well taken and this quantum meruit theory fails for this additional reason.

### 2. Failure of Proof

In support of its unauthorized transaction theory and its other mitigation theories, Defendant offered witness Tammie Thompson, identified as Defendant's Chief Financial Officer, and Exhibit NN. (Plaintiff's Motion in Limine No. 1 objected to Ex. NN on the grounds that the documents had not been previously disclosed and the setoff defense was outside the pleadings. AP Dkt. No. 228.)

Tammie Thompson testified that between October 2018 and April 2019, she managed a team of people engaged in billing and collecting Plaintiff's Receivables as well as Defendant's own receivables. Thompson Trial Testimony, Day 1, p. 79. She calculated that Defendant incurred costs of $554,545 based on employees' salaries plus payments to consultants and TruBridge. Exhibit NN purportedly documented this total. (The witness stated other numbers that conflict with this total. Thompson Trial Testimony, Day 1, p. 82-83, p. 98.) In addition,

*Damages*                                    -23-

her claim that the collection took strenuous and concerted effort by this team is contradicted by the fact that Defendant's CFO reported that Defendant had collected $1.2 million of the $1.7 million in Receivables by the end of December 2018 which casts doubt on the claim that collection took strenuous effort extending through March 2019. Pl. Ex. 58, Wade Report, p. 4.

Tammie Thompson's testimony was vague and inconsistent. It was not credible and is not entitled to any weight. Even her own attorney questioned her credibility at one point, suggesting perhaps the total for her time was "a little too high" in light of the fact that she testified she was the CFO for Defendant and its parent AAMG. Thompson Trial Testimony, Day 1, p. 96.

The court allowed Tammie Thompson to testify regarding the compilation of documents that made up Exhibit NN. However, after hearing argument and admitting into evidence Plaintiff's Rebuttal Exhibit 63, the court excluded Exhibit NN. [4]

The court agrees with Plaintiff that (1) the documents in Exhibit NN came within the scope of this Request; (2) Defendant had not previously produced any of these documents; and (3) the general boilerplate objections stated in Defendant's Response do not supplant the statement that all responsive documents were previously produced. Tammie Thompson admitted that she had only assembled the documents in Exhibit NN on August 4, 2021 - only

---

[4] Exhibit 63 was Plaintiff's Request for Production of Documents, Set No. 3. Plaintiff asked for any and all documents in Defendant's possession pertaining to any pre-September 9, 2018 receivables not previously produced. The Response stated general boilerplate objections to all Requests and as to this particular one stated "all previously produced."

*Damages*                                    -24-

days before trial, presumably at Defendant's attorney's request, and well after the close of discovery. Thompson Trial Testimony, Day 1, p. 105.

Because Exhibit NN was excluded and the witness's testimony is not entitled to any weight, Defendant's evidence failed to quantify any amount in support of any of its various mitigation theories.

### 3. Recoupment

Defendant also claims the theory of recoupment supports a reduction in Plaintiff's damages, citing In re TLC Hospitals, Inc., 224 F.3d 1008 (9th Cir. 2000). AP Dkt. No. 243, Def. Post-Trial Brief, p. 21. In TLC Hospitals, the Ninth Circuit explained that under setoff based on Bankruptcy Code §553, mutual debts arising from a single pre-petition transaction or separate pre-petition transactions cancel each other; recoupment, in contrast, is an equitable doctrine and a claim to recoupment must arise from the same transaction or occurrence that gave rise to the liability sought to be enforced by the bankruptcy estate and may involve pre-petition and post-petition events. Id. at 1011. Recoupment may only be used where it is inequitable for the debtor to enjoy the benefits of a transaction without meeting its obligations. Id. at 1014.

Defendant claims the single transaction for purposes of recoupment is the so-called unauthorized transaction based on the MRCA which was never submitted for court approval. While it is not entirely clear, Defendant is apparently asking for recoupment based on the theoretical 60% - 70% of the Receivables as proposed

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 25 of 30

in the MRCA. There is nothing equitable about this notion and the court finds no merit in this argument. In addition, recoupment - as a concept - addresses situations in which there has been an overpayment and an underpayment. Here, Defendant has made no payment at all.

### 4. Setoff as an Affirmative Defense

Plaintiff argues that Defendant waived any argument premised on setoff because Defendant failed to plead setoff as an affirmative defense as required by Rule 7008(c) (in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense). AP Dkt. No. 242, Pl. Post-Trial Brief, p. 11; AP Dkt. No. 228, Motion in Limine. An affirmative defense is defined as any matter extraneous to a plaintiff's prima facie case which denies a plaintiff's right to recover even if the allegations in the complaint are true. Marshack v. Orange Comm'l Credit (In re Nat'l Lumber and Supply, Inc.), 184 B.R. 74, 77 (9th Cir. BAP 1995).

Under Rule 7008(c), an affirmative defense is generally waived and excluded from the case if not pled in the answer. In re Bush, 2005 WL 6960185, at *6 (9th Cir. BAP Dec. 15, 2005) (statute of limitations; explaining purpose of Rule is to prevent surprise and prejudice by giving opposing party notice of affirmative defense and time to rebut it).

Defendant argues that setoff is not included in the list of affirmative defenses in Rule 7008(c) so it can be raised at any time, even on the first day of the second phase of a bifurcated trial. AP Dkt. No. 243, Def. Post-Trial Brief, p. 22. The court

Case: 19-01030   Doc# 244   Filed: 10/22/21   Entered: 10/22/21 22:33:25   Page 26 of 30

disagrees. Setoff is a matter of avoidance and is an affirmative defense covered by Rule 7008(c). <u>Slack v. Int'l Union of Operating Engrs.</u>, 83 F.Supp.3d 890, 908 (N.D. Cal. 2015) (noting defendant's argument was in the nature of a set-off argument and as such would be an affirmative defense).

Defendant's suggestion that it timely raised this setoff issue because Exhibit NN was on its exhibit list hardly warrants a response. Because this theory was raised for the first time at trial, Plaintiff was never given an opportunity to do discovery regarding this testimony or the related documents which were never produced, and had no opportunity to rebut it. Defendant never sought to amend its Answer or Counterclaim and there was no pretrial order in this case including setoff as one of the issues the parties agreed to try.

### E. Prejudgment Interest and Costs

Plaintiff seeks an award of pre-judgment interest under California Civil Code §3287(a) which provides:

> A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day.

In <u>Evanston Ins. Co. v. OEA, Inc.</u>, 566 F.3d 915, 920 (9th Cir. 2009), the Ninth Circuit explained that the vesting requirement is satisfied when the amount is certain not when the liability to pay the amount is determined. Here, the amount of accrued Receivables vesting each month from September 2018 through April 2019 is shown in Exhibit 59.

*Damages*                    -27-

Defendant argues that Plaintiff is not entitled to interest because the amount of the Receivables was uncertain, citing cases in which court's determined interest under Civil Code §3287(a) was not appropriate for various reasons. <u>Warren v. Kia Motors</u>, 30 Cal.App.5th 24 (2018) (uncertain because defendant had no means to calculate damages); <u>Jamison v. Jamison</u>, 164 Cal.App.4th 714 (2008) (uncertain because of conflicting evidence regarding value of asset).

Defendant's argument misses the point. The amount of the Receivables was not uncertain and the precise dates on which each increment vested is shown in Exhibit 59. As of September 30, 2021, the amount of pre-judgment interest was $446,646.80 and it continues to accrue at $415.06 per day.

Plaintiff is also entitled to an award of costs and when a bill of costs is filed, it will be reviewed and appropriate costs will be awarded.

**V. Conclusion**

For all the reasons explained above, Plaintiff is entitled to a judgment awarding damages as he requested. Plaintiff does not have unclean hands, has not acted in bad faith, will not receive a windfall, and was not negligent in handling this litigation or the chapter 7 case. Despite its claim to the contrary in its Post-Trial Brief, Defendant never had a "cogent basis to believe" it owned the Receivables and has no valid basis for any of its mitigation theories.

1    The court requests that Plaintiff submit an order conforming
2    to this ruling and a bill of costs. A judgment will be entered in
3    due course.

4

5               * * * * * End of Memorandum Decision * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Damages*                              -29-

1 <u>Court Service List</u>

2 None required.

*Damages*                              −30−